UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KAREN G. KERKAU,

                Plaintiff,                            Civil Action No. 12-CV-11520

        v.                                     District Judge Victoria A. Roberts
                                                  Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO GRANT IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

Plaintiff Karen G. Kerkau appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her applications for period of disability, disability insurance benefits, and supplemental security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 12, 14). For the reasons set forth below, this Court finds that the Administrative Law Judge failed to appropriately weigh a treating medical source opinion. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

Kerkau was 39 years old on the date she alleges she became disabled. (*See* Tr. 94.) She has a high school education (Tr. 26, 117) and has worked primarily in food service (Tr. 116, 125). Kerkau stopped working when she was laid off in June 2007. (Tr. 115.) She alleges disability on the basis of back pain beginning at that time. (Tr. 27, 115.) Kerkau has undergone two surgeries on her back, in February 2009 and November 2009. (Tr. 250, 268.)

### A. Procedural History

On September 16, 2009, Plaintiff protectively filed for disability insurance benefits ("DIB") and supplemental security income ("SSI") asserting that she became unable to work on June 6, 2007. (Tr. 36, 37, 94-103.) Plaintiff had disability insurance coverage through March 31, 2011. (Tr. 12.) The Commissioner initially denied Plaintiff's disability application on January 8, 2010. (Tr. 36, 37.) Plaintiff then requested an administrative hearing, and on August 2, 2010, she appeared with counsel before Administrative Law Judge ("ALJ") Andrew G. Sloss, who considered her case *de novo*. (Tr. 23-35.) In an August 12, 2010 decision, ALJ Sloss found that Plaintiff was not disabled. (*See* Tr. 12-18.) The ALJ's decision became the final decision of the Commissioner on February 13, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on April 4, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

Kerkau visited the Helen M. Nickles Volunteer Clinic on October 29, 2008, complaining of pain in her tailbone and numbness in her legs and feet. (Tr. 182.) On examination, board-certified family nurse practitioner Joyce E. Burke noted scoliosis, spasm, and tenderness in Kerkau's spine at L5. (*Id.*) Nurse Burke prescribed Flexeril and Naprosyn and requested an x-ray. (*Id.*) The October

2

30 x-ray of Kerkau's lumbar spine, sacrum, and coccyx revealed no abnormalities. (Tr. 186-87.) At a recheck appointment on November 12, 2008, Kerkau reported tightness and cramping in her right buttock, hip, and calf, and numbness in toes on both feet.  (Tr. 181.) Nurse Burke adjusted Kerkau's medications, discussed exercises, and set another recheck for one month. (*Id.*) On December 17, 2008, Kerkau was again examined at the clinic (the provider signature is illegible) and was diagnosed with bilateral lumbar radiculopathy. (Tr. 180.) An MRI of the lumbar spine was scheduled. (*Id.*)

The radiologist's impression from an MRI of Kerkau's lumbar spine on January 13, 2009, was "[l]arge central diffuse herniation of L4-5 with moderate to severe central canal stenosis and moderate to severe narrowing of the neural foramina, greater on the left than the right." (Tr. 185.) A hand-written note at the bottom of the MRI report, signed illegibly and dated January 15, 2009, says "[a]bnormal collapsed disc pressing on spinal cord & nerves to legs," and "refer Neurosurgery." (*Id.*)

After reviewing the MRI and examining Kerkau on January 20, 2009, neurosurgeon Ravindra N. Goyal believed Kerkau had right L5 radiculopathy consequent upon the right L4-L5 herniated disk, but noted that Kerkau also had a history of left L5 radiculopathy. (Tr. 237.) Dr. Goyal recommended bilateral L4-L5 lumbar laminotomy and discectomy and interlaminar and facet fusion. (Tr. 237.)

Kerkau underwent surgery on her back on February 11, 2009: right L4-L5 lumbar laminotomy, diskectomy, and foraminotomy; left L4-L5 lumbar laminotomy, diskectomy, foraminotomy; and Aspen lumbar spinal fusion including facet fusion. (Tr. 250.)

According to Dr. Goyal, who examined her in April, May, and July 2009, Kerkau did very

well for several months after the surgery. (Tr. 234, 235, 236.) Her symptoms were "resolved" and she began weaning off the back brace. (Tr. 235.) The findings from a post-surgery x-ray of Kerkau's lumbar spine on April 7, 2009, stated: "There are two metallic plates for posterior fusion at the level of L4-L5. There is narrowing of the disc space at L4-5. No compression deformity." (Tr. 196.) A follow-up x-ray on May 19, 2009, found the metallic plates were "radiographically stable in appearance in the interval," and there was "[n]o new abnormality." (Tr. 195.) Findings from another x-ray on July 23, 2009, again stated "[t]he appearance is stable," and added: "Vertebral alignment appear fairly well maintained." (Tr. 194.) Again there was "[n]o new abnormality." (*Id.*) Another x-ray on September 15, 2009, had similar findings, stating: "We again note metallic plate for posterior fusion at the level of L4-L5, stable in appearance. There is narrowing of the disc space at L4-L5. No compression deformity. The sacroiliac joint appears within normal limits. No new abnormality." (Tr. 193.)

Around September 2009, Kerkau twisted while vacuuming and had sudden severe low back pain. (Tr. 233.) Her leg pain also returned. (*Id.*) On October 13, 2009, Dr. Goyal reviewed an MRI taken on October 7, 2009, and found it showed "large disk herniation at L4-L5 which is mainly central" as well as evidence of spinal canal stenosis. (Tr. 232.) The radiologist who interpreted the MRI stated: "Previously demonstrated disc herniation at L4-5 has progressed significantly since the prior exam. . . . There is suspicion of a small and subtle posterior annular tear at the L5-S1 level as well, although no significant neurologic incursion is identified." (Tr. 240.) Dr. Goyal also reviewed an October 7, 2009 EMG nerve conduction study. (Tr. 232.) The doctor who interpreted the EMG results, W. H. Lawrence, D.O., stated: "This is an abnormal study indicative of mild to moderate, chronic bilateral L5 radiculopathies with ongoing denervation on the right only." (Tr. 241.) Dr.

4

Goyal recommended surgery to remove the hardware that had been placed in her previous surgery, and suggested that it might be necessary to "do a pedicle screw and rodding instead of the Aspen." (Tr. 232.)

On October 21, 2009, neurosurgeon S. Sriharan evaluated Kerkau at the request of Dr. Goyal for a second opinion regarding her back. (Tr. 224.) After examining Kerkau and reviewing a recent MRI scan, Dr. Sriharan recommended another decompression and fusion surgery, this time with pedicle screws and a TLIF (Transforaminal Lumbar Interbody Fusion) graft. (Tr. 225.) The surgery was performed by Dr. Sriharan on November 6, 2009. (Tr. 268.) On December 23, 2009, Dr. Sriharan reported that Kerkau was "doing quite well" with "some back soreness" but "her legs are feeling better" and her x-ray "shows nice stable fusion." (Tr. 297.)

On December 3, 2009, family practice doctor Gary Tamez of Bayside Health Center completed a medical examination report on a Michigan Department of Human Services form. (Tr. 315-16.)[1] Dr. Tamez stated that he first examined Kerkau on November 20, 2009, and most recently had examined her on December 3, 2009. (Tr. 315.) He identified back pain, limited range of movement, and weakness in the lower extremities as her chief impairments. (*Id.*) He indicated that her condition was "stable" rather than "improving" or "deteriorating," and that her limitations were expected to last more than 90 days. (Tr. 316.) Dr. Tamez provided that Kerkau could never lift or carry any amount of weight, could stand and/or walk less than two hours in an eight-hour workday, required a brace for ambulation, could never perform repetitive action with her lower extremities, and could never repetitively push or pull with her upper extremities. (*Id.*) Simple grasping, reaching, and fine manipulation with her upper extremities was not limited, and he indicated that she had no

---

[1] The form is also signed by nurse practitioner Monica Mackenzie. (Tr. 316.)

5

mental limitations except that she should not operate machines due to her medications (Vicodin, Neurontin, Flexeril, and Elavil). (*Id.*) Dr. Tamez also indicated that Kerkau could meet her needs in the home. (*Id.*) The medical findings that supported these limitations, Dr. Tamez wrote, were "disc herniations [status post] 2 back surgeries." (*Id.*) He also wrote, where the form instructed that laboratory and x-ray findings be attached, "see MRI + neurosurgeon reports." (Tr. 315.) If the MRIs and reports were attached, however, the record does not reflect that.

Disability Determination Service (DDS) medical consultant Dr. Dale Blum completed a physical RFC assessment form for Kerkau on January 7, 2010. (Tr. 299-306.) The assessment was based on Dr. Blum's review of Kerkau's records; he did not examine her. (*Id.*) Dr. Blum specified that his RFC assessment "pertains to 12 months from EOD[2] of 9/15/09." He stated that there was insufficient evidence prior to July 2008, and from July 2008 to June 2009, Kerkau was "E1 as claimant did well after initial surgery." (Tr. 300.) According to the SSA manual, the code "E1" refers to a denial of benefits because the "condition was not severe enough for 12 months in a row." SSA POMS § DI 26530.025, *available at* http://policy.ssa.gov/poms.nsf/lnx/0426530025; SSA POMS § NL 00708.100, *available at* http://policy.ssa.gov/poms.nsf/lnx/0900708100.

According to Dr. Blum's RFC assessment, Kerkau could lift and/or carry 20 pounds occasionally and 10 pounds frequently and could stand and/or walk about six hours and sit about six hours (with normal breaks) in an eight-hour workday. (Tr. 300.) He opined that "although claimant seems to be doing better currently, it is likely she will continue to be limited in exertion in the future

---

[2] The EOD or Established Onset Date is "the date the disability adjudicator determines the claimant's disability began based on the medical and other evidence in the case record." SSA Program Operations Manual System ("POMS") § DI 25501.001(E)(3), *available at* http://policy.ssa.gov/poms.nsf/lnx/0425501001.

due to type of problem and recurrent surgery to back. In view of this it is likely claimant will be limited to light activities as above. Also pushing/pulling with [bilateral lower extremities] should be limited to occasional." (Tr. 300-301.) For postural limitations, Dr. Blum provided that Kerkau should never climb ladders, ropes, and scaffolds, only occasionally climb ramps and stairs, and only occasionally stoop, kneel, crouch, or crawl. (Tr. 301.) For environmental limitations, Dr. Blum provided that "extreme cold, wetness, and vibration should be limited due to aggravation of back pain." (Tr. 303.)

A March 10, 2010 x-ray of Kerkau's lumbar spine showed "postoperative changes of spinal fusion at L4-L5" but "no acute fracture, spondylolysis or spondylolisthesis." (Tr. 314.) Dr. Sriharan wrote on March 10 that Kerkau was "doing quite well. Her legs are fine with a little bit of tightness on her back." (Tr. 317.) He reviewed her x-ray and wrote that it showed "stable fusion construct, though I do not see a solid bony fusion just yet." (*Id.*)

On June 16, 2010, Dr. Sriharan followed up with Kerkau again and reported that she was "doing well, a little bit of back discomfort depending on the level of activity but nothing in the legs." (Tr. 326.) Her x-ray "showed a stable fusion." (*Id.*) Dr. Sriharan recommended that she start aqua therapy for her back, "to own tolerated pace." (*Id.*) The radiologist who reviewed Kerkau's June 16, 2010 x-ray wrote: "alignment is maintained, there is disc space narrowing at the same L4-5 level." (Tr. 327.)

### C.  Testimony at the Hearing Before the ALJ

#### 1.  *Plaintiff's Testimony*

At a hearing before ALJ Sloss on August 2, 2010, Kerkau testified that she got leg cramps "real bad down my legs," and she could not twist, bend, lift, or squat. (Tr. 27, 30-31.) She also had

a hard time sleeping. (*Id.*) The most comfortable position for her was lying down, but she also had to keep moving. (*Id.*)

Kerkau said the only housework she was able to do was "dishes and fold some laundry." (Tr. 28. Her cooking was limited to microwaving meals, sandwiches, or cereal. (*Id.*) Her shopping was limited to grocery shopping; "about 20 minutes in the store and that's it." (*Id.*) She said she spent her time reading and watching TV. (*Id.*)

Kerkau testified that she could lift a gallon of milk, and could walk a quarter to half of a mile. (Tr. 28-29.) She could sit around ten minutes at a time before her "butt starts to go numb" and her ribs "just ache." (Tr. 29.) She got up and walked around or lied down to relieve the discomfort. (*Id.*)

On examination by her attorney, Kerkau testified that she also had "bad anxiety" and was "quite afraid" to do housework or use her back because she hurt herself while vacuuming after the first back surgery. (Tr. 29.) She was taking Cymbalta for depression and anxiety, as well as taking Flexeril, Lortab, and Neurontin. (Tr. 30.) She said she could stand in one place for about ten minutes at a time but it "is very hard without leaning on something or something on that order." (*Id.*) Kerkau was still in physical therapy, and went to aqua therapy for 45 minutes twice a week. (Tr. 31.) Her average level of pain was "about a four." (*Id.*) It was "probably about seven" when she got up in the morning, before she started moving around and took some Tylenol. (*Id.*)

### 2.  *The Vocational Expert's Testimony*

At the hearing, the ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Plaintiff's. The ALJ asked about job availability for a hypothetical individual of Plaintiff's age, education, and

work experience who was capable of "light work as defined by the regulations[3] except that she can only occasionally push or pull with her legs bilaterally; she can never climb ladders, ropes, or scaffolds, and can only occasionally climb ramps or stairs; she can frequently balance and can occasionally stoop, crouch, kneel, or crawl," and "must avoid concentrated exposure to extreme cold and humidity and . . . excessive vibration." (Tr. 33.) The VE testified that there would be jobs in the regional economy that such an individual could perform, including usher (4,400 jobs), counter clerk (3,200 jobs), and cashier (33,000 jobs). (*Id.*)

The VE also testified that competitive work at all exertional levels would be precluded for an individual who was unable to engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week for a full 40-hour workweek or an equivalent work schedule. (Tr. 33-34.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), disability insurance benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

---

[3] The RFC category of light work is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b). Agency guidance further defines "a good deal of walking or standing" as "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10. (Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); *Heckler v. Edwards*, 465 US 870, 873 n.3 (1984).)

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Sloss found that Kerkau had not engaged in substantial gainful activity since the alleged disability onset date of June 6, 2007. (Tr. 14.) At step two, he found that Kerkau had the following severe impairment: degenerative disc disease. (Tr. 14-15.) Next, the ALJ

concluded that Kerkau does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (Tr. 15.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform

> light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except the claimant can only occasionally push or pull with her lower extremities. She can never climb ladders, ropes or scaffolds, and can only occasionally climb ramps or stairs. She can frequently balance, and can occasionally crouch, knee or crawl. She must avoid concentrated exposure to extreme cold and wetness and to excessive vibration.

(Tr. 14-17.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 17.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 17-18.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 18.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks

omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Kerkau first argues that the ALJ erroneously relied upon the opinion of DDS consultant Dr. Blum to formulate the RFC. (Pl.'s Mot. Summ. J. at 4-5.) Dr. Blum filled out an RFC Assessment form in which he stated that the RFC he recommended "pertains to 12 months from EOD of 9/15/09." (Tr. 300.) According to Kerkau, this means that it represents her RFC for the period "September 15, 2010 and after," and it is therefore not relevant to determine her RFC between June

12

6, 2007, her alleged disability onset date, and August 12, 2010, the date of the ALJ's decision. (Pl.'s Mot. Summ. J. at 5.) This argument is not well taken. It was reasonable for the ALJ to understand that Dr. Blum's opinion pertained to the 12-month period beginning on September 15, 2009. An ALJ's reasonable inferences are accorded deference even if the evidence can support a contrary conclusion. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

Kerkau stumbles onto a more significant issue when she argues that the ALJ "failed to provide any analysis or evaluation of his interpretation of Dr. Blum's opinion when considered against the opinion of the Plaintiff's treating source, Dr. Gary T[a]mez." (Pl.'s Mot. Summ. J. at 5-6.) As the Sixth Circuit recently re-emphasized, "[a]s a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source') . . . and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source')." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). The opinion of a treating physician, in particular, is the subject of a special rule: such an opinion must be given controlling weight if it is well-supported and not inconsistent with the record, and even if it is not given controlling weight, it is subject to a rebuttable presumption of deference. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 242; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). In addition, there is a procedural requirement that the ALJ expressly provide "good reasons" for the weight assigned to a treating-source opinion. *See Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544; SSR 96-2p.

Both Kerkau and the Commissioner assume that Dr. Tamez is a treating medical source (Pl.'s

13

Mot. Summ. J. at 5-6; Def.'s Mot. Summ. J. at 10), but this assumption may not be left unquestioned. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("Before determining whether the ALJ violated *Wilson* by failing to properly consider a medical source, we must first classify that source as a 'treating source.'"). A physician qualifies as a treating source if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith*, 482 F.3d at 876 (citing 20 C.F.R. § 404.1502). A physician seen infrequently can be a treating source "if the nature and frequency of the treatment or evaluation is typical for [the] condition." *Id.*

Dr. Tamez may have seen Kerkau only twice at the time of his December 3, 2009 opinion; he said he first examined Kerkau on November 20, 2009, and most recently had examined her on December 3, 2009. (Tr. 315.) *See Kornecky*, 167 F. App'x at 506 ("The question is whether [the physician] had the ongoing relationship with [Plaintiff] to qualify as a treating physician *at the time he rendered his opinion*."). There is some indication that Dr. Tamez may have made a mistake; Kerkau identified him as her primary care physician on September 29, 2009, and stated that her first visit with him took place on September 9, 2009. (Tr. 118.) She also said she was due to see him on October 2, 2009. (*Id.*) In addition, Dr. Tamez is identified as an admitting physician, along with the neurosurgeon Dr. Sriharan, on Kerkau's preadmit testing report for her second back operation; that report is dated November 4, 2009. (Tr. 266-67.)

Unfortunately, the record is incomplete with respect to Dr. Tamez's treatment of Kerkau. On October 1, 2009, DDS sent a request for records from "August 2009 to present" to Bayside Health Center on Monitor Road in Bay City, Michigan—the facility identified on Dr. Tamez's opinion and elsewhere (Tr. 118, 160, 316, 317)—and received just a few pages of handwritten notes from

14

examinations on September 11, 2009, and October 2, 2009. (Tr. 210-16, 308.) The signatures on those notes are not legible, so it is not clear whether Dr. Tamez was the examining physician. (Tr. 215-16.)[4] The notes are difficult to read, but it is apparent that Kerkau sought and received treatment for lower back pain. (Tr. 215-16.)

Assuming that Dr. Tamez saw Kerkau only twice, he may nonetheless qualify as a treating medical source. The case law is clear that one examination is generally not sufficient, but two is a closer issue. *See Kornecky*, 167 F. App'x at 507 ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. . . .  Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."). In *Smith v. Commissioner or Social Security*, the Sixth Circuit determined that a doctor was not a treating source where he "examined Smith, completed a medical report, prescribed and refilled back pain medication, and denied additional medication when Smith returned seeking more." 482 F.3d at 876. The court reasoned that those contacts "fail to evince the type of ongoing treatment relationship contemplated by the plain text of the regulation." *Id.* The regulation provides that the opinion of a treating source should be given more weight because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

---

[4] It appears that Kerkau also received treatment from a Dr. Teona Maghlakelidze at Bayside Health Center on Monitor Road in Bay City, the same address given for Dr.Tamez. (*See* Tr. 224, 297; *see also* Tr. 241.)

In this case, there is evidence that Dr. Tamez was responsible for monitoring Kerkau's progress in a way that strongly suggests the "ongoing treatment relationship" that the regulations and case law describe as deserving of deference. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Kerkau viewed Dr. Tamez as her "Family doctor." (Tr. 118.) He saw her two times in less than a month; although this is a short period of time over which to form a "longitudinal relationship," the short interval indicates he was following her condition closely. (*See* Tr. 315.) As noted above, Dr. Tamez was identified as an admitting doctor on the November 4, 2009 preadmit testing report for Kerkau's second back operation. (Tr. 266-67.) It also appears that Kerkau's neurosurgeon Dr. Goyal sent Dr. Tamez a letter on October 13, 2009, regarding her need for more surgery (another doctor's name is crossed out and "Dr. Tamez" is handwritten as the addressee). (Tr. 232.) And the neurosurgeon for Kerkau's second surgery, Dr. Sriharan, addressed a letter regarding her recovery progress to Dr. Tamez in March 2010—after Dr. Tamez's opinion was written, but suggesting that there was an established, ongoing relationship. (Tr. 317.) Dr. Tamez may not be due controlling deference, and his opinion may be due less weight in light of the short time he treated Kerkau before rendering it, but the ALJ should have applied the treating physician rule to determine how much weight to give the opinion.

Even assuming Dr. Tamez was not a treating source, he was clearly an examining source, and is therefore generally due greater weight than Dr. Blum, a nonexamining source. *See Gayheart*, 710 F.3d at 375. And even if the treating physician rule's "good reasons" requirement did not apply to compel an explanation for the weight given Dr. Tamez's opinion, an ALJ must always provide enough explanation for a reviewing court to understand how he or she reached the disability determination. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 518 (6th Cir. 2011) (reversing

where the ALJ failed to discuss his reasons for rejecting an examining doctor's opinion in favor of a non-examining doctor's opinion on a key issue); *Beck v. Comm'r of Soc. Sec.*, No. 12-CV-11067, 2012 WL 7827842 (E.D. Mich. Dec. 26, 2012) (recommending remand where the ALJ did not adequately explain how he accounted for an examining physician's opinion), *report and recommendation adopted*, 2013 WL 1317013 (E.D. Mich. Mar. 29, 2013); *see also Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) ("Moreover, an 'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'") (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The record includes just two medical opinions regarding the details of Kerkau's RFC. Non-examining Dr. Blum said she could occasionally lift 20 pounds and frequently lift 10 pounds, and could stand and/or walk six of eight hours. (Tr. 300.) Dr. Tamez said she could never lift/carry any weight and could stand and/or walk less than two of eight hours. (Tr. 316.) The ALJ gave Kerkau an RFC of "light," which requires lifting up to 20 pounds and frequently lifting 10 pounds, and standing or walking six of eight hours. (Tr. 15.) *See* 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10. The ALJ also provided that Kerkau could occasionally push or pull with her lower extremities, with no limitations on her upper extremities, in accord with Dr. Blum's RFC but in contrast to Dr. Tamez's opinion that Kerkau could never perform repetitive action with her lower extremities and could never repetitively push or pull with her upper extremities. (Tr. 15, 300, 316.) In other words, the ALJ appears to have adopted Dr. Blum's RFC assessment, without explicitly saying so, and rejected Dr. Tamez's RFC assessment.

The ALJ did not adequately explain why he departed from the general rule favoring treating

17

and examining source opinions over non-examining source opinions. *See Gayheart*, 710 F.3d at 375. The ALJ stated that he "considered the medical statement from Dr. G. T[a]mez, and accords the opinion limited weight as it lacks support and is inconsistent with the records provided." (Tr. 16.) The ALJ also provided a factual summary of Dr. Tamez's opinion: "Dr. Gary T[a]mez, from Bayside Health Center, completed a medical examination report indicating that he had last examined the claimant on December 3, 2009. The current diagnosis was status post back surgeries, times two. The clinical impression was stable. The doctor opined that claimant could not lift or carry any weight. She could stand and/or walk up to less than 2 hours in an 8-hour workday. She required and needed a brace for ambulation. She could not use her feet/legs for operating foot/leg controls and could not use her hands/arms for pushing/pulling. She should not operate machines. Her medications included Vicodin, Neurontin, Flexeril and Elavil." (Tr. 15.) No further analysis of Dr. Tamez's opinion was provided. The ALJ does not even mention Dr. Blum or his opinion in the decision.[5]

The ALJ's failure to explain his reasons for giving greater weight to a non-examining source than to a treating source—even one whose treatment relationship was brief—requires remand. This court is unable to determine why the ALJ found Dr. Blum's RFC more persuasive than Dr. Tamez's. While Dr. Tamez's opinion could be said to "lack support" insofar as he had examined Kerkau only twice and the contemporaneous notes of those examinations are not in the record, absent another reason for discounting his opinion, it still would be entitled to greater weight than the opinion of Dr. Blum, who merely reviewed records and never saw Kerkau in person. The ALJ's statement that Dr. Tamez's opinion "is inconsistent with the records provided" is conclusory and plainly inadequate.

---

[5] The ALJ did state during the hearing that the hypothetical question he posed to the VE was based on Dr. Blum's opinion. (Tr. 33.)

18

The ALJ has not specifically identified any inconsistencies, and this court declines to undertake such analysis *de novo*. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

Moreover, the ALJ's finding that Dr. Tamez's opinion "lacks support  and is inconsistent with the records" addresses only the first half of the treating source rule. An opinion that is not well supported and/or is inconsistent with the record is not entitled to controlling weight, but the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c) must then be applied to determine how much weight to assign the opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. The factors to be applied are:  (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the supportability of the treating-source opinion, (4) the "consistency of the opinion with the record as a whole," (5) "the specialization of the treating source," and (6) any other factors "which tend to support or contradict the opinion." 20 C.F.R. §§ 404.1527(c), 416.927(c).

The ALJ has given no indication whether or how he considered the length, frequency, nature, and extent of Dr. Tamez's treatment relationship with Kerkau, the doctor's lack of specialization, or other factors such as Dr. Tamez's familiarity with Kerkau's other treatment records. Although he mentioned supportability and consistency, the ALJ has provided no substance to be evaluated, as discussed. In short, there is no way for this court to evaluate whether the ALJ has complied with the treating source rule. The factors that weigh against Dr. Tamez—that he saw Kerkau only twice, and began treating her only a few months before rendering his opinion, that he is a family

19

practitioner rather than a specialist, and that the contemporaneous notes of his examinations are not in the record—weigh equally against Dr. Blum, who never treated or examined Kerkau and whose speciality is emergency room medicine.[6] It is possible that the ALJ discounted Dr. Tamez's opinion because it was written just one month after Kerkau's operation, while Dr. Blum's was written two months post-operation and benefitted from Dr. Srirahan's late December assessment that Kerkau's recovery was going well (Tr. 297), but this Court cannot affirm based on such speculation. *See Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir. 1991) ("Courts are not at liberty to speculate on the basis of an administrative agency's order."). This Court recommends remanding for a proper evaluation of Dr. Tamez's opinion.

Kerkau also argues that the ALJ erred in assessing her credibility. (Pl.'s Mot. Summ. J. at 8-10.) But in evaluating Kerkau's credibility, the ALJ reasoned that the "medical evidence of record does not contain objective signs and findings that would account for the severe symptomology alleged by claimant. (Tr. 16.) The ALJ's findings on Kerkau's credibility may change after Dr. Tamez's opinion is reevaluated on remand. Accordingly, this Court recommends denying Kerkau's second claim of error as moot.

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the Administrative Law Judge failed to appropriately weigh a treating medical source opinion. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the

---

[6] Dr. Blum's "medical consultant's code" is identified as "10," which corresponds to "Emergency Room Medicine" according to the SSA manual. See Tr. 306; SSA POMS § DI 26510.090, *available at* http://policy.ssa.gov/poms.nsf/lnx/0426510090.

decision of the Commissioner of Social Security be REMANDED.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson_____
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  May 13, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 13, 2013.


s/Jane Johnson_____

Deputy Clerk